PLOTKIN, Judge.
Appellant Vanessa Jones appeals a juvenile court judgment which terminated her parental rights concerning her natural children, Nikill Jones, a male, born March 14, 1980, and Charmaine Jones, a female, born April 3, 1982, on the basis of LSA-R.S. 13:1601. We affirm.
FACTS
Nikill and Charmaine Jones were initially removed from their mother’s custody on September 25, 1985, when they were five and three years of age, respectively. The affidavit attached to the document which ordered that the children be placed into the custody of the State of Louisiana Department of Health and Human Resources indicates that Ms. Jones and the two children had been living on the streets for a week before the State intervened. The mother had voluntarily left two different shelters; they had been evicted from their house more than a month earlier. The affidavit also indicated the following:
The complainant stated the children had not eaten anything that day. The children were deplorable. Their clothing were dirty and smelled of urine. They all had foul body odors.... The mother refused to cooperate with worker or police officers.
The record in this case indicates that neither child has a legal father and that no formal acknowledgment of either child exists. The children were adjudicated “Children in Need of Care" by the Orleans Par *666 ish Juvenile Court on March 24, 1987 and were placed into foster care. On February 12, 1988, the state filed a petition to terminate Ms. Jones’ parental rights.
In its Petition for Termination of Parental Rights, the State alleged that the children were removed from the custody of their mother “due to her severe mental illness, chronic schizophrenia, which was so profound that it rendered her incapable of exercising parental responsibility without exposing the children to a substantial risk of serious harm.”
This case was tried on four separate days, July 25, 1988, October 19, 1988, November 18, 1988, and January 20, 1989. In a judgment dated March 16, 1989, Ms. Jones’ parental rights were terminated, freeing the children for adoption. In her oral reasons for judgment, the juvenile court judge stated as follows:
I have reviewed all the memoranda that was submitted and I have listened to all of the tapes again, and, although it’s not an absolutely, positively, clear-cut case, I feel I should go ahead and terminate the parental rights.
I feel that the possibility of Miss Vanessa Jones’ ability to parent the children adequately in the future is very, very slim, shaky, poor. And, although it may well be that she is getting her life together at long last, I think it’s just too little, too late.
I think it’s in the best interest of the children that the parental rights be terminated and they be freed for adoption.
Ms. Jones appeals.
PERTINENT LAW
The State sought termination of Ms. Jones’ parental rights on the basis of LSA-R.S. 13:1601(B) or (D), which provide as follows:
Sec. 1601: Petition for the termination of parental rights
The court on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court’s jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsection A, B, C, D, E, or F of this Section....
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2)The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
[[Image here]]
D. (1) The child has been in the custody of a child welfare department or other person, pursuant to a judicial order, for a period of at least one year.
(2) The child was removed from the custody of the parents by judicial order due to the parent’s abuse or neglect of the child.
(3) The parent is unfit to retain parental control and there is no reasonable expectation of reformation on the part of the parent or parents.
(4) The child is an abused or neglected child, the Department of Health and Human Resources has made every reasonable effort under the circumstances to reunite the child with his parents, and the department recommends that it would not be in the best interest of the child to be reunited with his parents.
LSA-R.S. 13:1601 allows for termination of parental rights if the State proves all the elements of any one of the six subsections under that statute. The burden of proof is one of clear and convincing evidence. State in the Interest of C.P., 463 So.2d 899 (La.App. 2d Cir.1985). Thus, the juvenile court judgment terminating Ms. Jones’ parental rights must be affirmed if the State proved by clear and convincing evidence all of the elements of LSA-R.S. 13:1601(B) or all the elements of LSA-R.S. 13:1601(D).
In the instant case, Ms. Jones claims that the State failed to meet its burden of proving all the elements required by either sub *667 section because it failed to prove that she has not “reformed” and that she is unlikely to reform, as required by (B)(2) and (D)(3). Additionally, Ms. Jones claims that the State failed to prove that it had made every reasonable effort to reunite her with her children, as required by LSA-R.S. 13:1601(D)(4).
REFORMATION
The juvenile court judgment terminating Ms. Jones’ parental rights is premised on an implied finding that she is “unfit” to rear her children. That term is defined by LSA-R.S. 13:1600(6), in pertinent part, as follows:
“Unfit refers to a parent:
[[Image here]]
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
In the instant case, the juvenile court judgment that Ms. Jones is “unfit” is premised on the following facts: (1) Ms. Jones suffers from a chronic mental illness, which is unlikely to improve because she has failed to seek proper treatment, and (2) Ms. Jones has not had a home of her own or a steady source of income since her release from Southeast Louisiana State Hospital.

Mental Illness

The evidence presented at trial indicates that Ms. Jones has been repeatedly diagnosed as suffering from the chronic mental condition of paranoid schizophrenia. Her history of treatment for her mental illness prior to 1986 is somewhat unclear. The record indicates that Ms. Jones was taken to the psychiatric unit of Charity Hospital by New Orleans Police officers on either one or two occasions in late 1985 because of aggressive or violent behavior.
On February 14, 1986, Ms. Jones was admitted to Southeast Louisiana Hospital on a Physician’s Emergency Certificate executed at West Jefferson Mental Health Clinic. Dr. Hossam Abou-Taleb, who admitted Ms. Jones to Southeast, testified at trial that at the time of her admission, Ms. Jones was in a psychotic state. She was experiencing auditory hallucinations, paranoid delusions, loose associations, and flat affect, and she had a history of bizarre behavior, all symptoms of paranoid schizophrenia. Ms. Jones received three months of in-patient therapy. At the time of her discharge on May 2, 1986, the symptoms of her illness were under control and she was no longer psychotic. Dr. Abou-Taleb testified that Ms. Jones’ recommended aftercare was continued medication and regular appointments at the mental health clinic.
Ms. Jones was referred to West Jefferson Mental Health Center in Harvey following her discharge, but James Renfro, a mental health center employee, testified at trial that Ms. Jones never pursued followup. He stated that Ms. Jones was seen twice at the center by a Dr. Arneson, then never returned. Her records at the center reveal numerous missed appointments, Renfro stated, and her file was eventually closed because she had not been seen for six months and because she had indicated that she was moving to Alabama.
The parties stipulated that Ms. Jones was seen at the New Orleans Mental Health Center during January of 1987 and May of 1987. She was scheduled for a psychiatric evaluation, but failed to show up. She had no further contact with the center.
Dr. Champa Chakraborti conducted a court-ordered psychiatric evaluation of Ms. Jones on August 10, 1987 after Ms. Jones missed numerous previous appointments. Her diagnosis was schizophrenia in a residual state. She listed numerous symptoms of the disease, including anger, hostility and negative attitudes toward many of the people in her life. Additionally, Dr. Chak-raborti noted that Ms. Jones presented a very erratic, tangential, disorganized thought process and had some paranoid delusions. Dr. Chakraborti stressed the importance of properly administered medi *668 cation in controlling Ms. Jones’ disease. She stated that Ms. Jones is not capable of caring for her kids and recommended that the State terminate Ms. Jones parental rights.
Additional psychiatric evaluations were conducted on April 24, 1987 by Brian T. Jordan, Ph.D., for the Office of Human Development when Ms. Jones applied for social security disability benefits on the basis of her mental condition, and on April 29, 1988 by Craig W. Maumus, M.D. Although neither of those doctors testified at trial, their reports were admitted into evidence. Their conclusions were similar to those reached by Dr. Chakraborti. Additionally, Dr. Jordan found that Ms. Jones was functioning in the borderline retarded range.
All of the above evidence concerning Ms. Jones’ mental condition and her failure to consistently pursue treatment for the illness was given on the first day of trial on July 25, 1988. As the juvenile court judge indicated in her reasons for judgment, some evidence was presented during the last two days of the trial that Ms. Jones had taken some steps to seek treatment for her illness and that some improvement had occurred. Adrian Boutin, Ms. Jones’ case manager for the Office of Child Security, testified on November 18, 1988, that Ms. Jones had become enrolled in mental health treatment in June of 1988, and that she was progressing some with her current treatment according to an evaluation done in September of 1988. However, Ms. Bout-in repeatedly testified that the changes were not so significant that the department would consider withdrawal of the termination recommendation. Additionally, she noted that the conclusion that Ms. Jones was doing better was based solely on the patient’s own reports.
The only other evidence presented at trial that Ms. Jones has made some improvements in her mental condition was in her own testimony. Ms. Jones testified on January 20, 1989 that she is on medication and doing fine. She stated that she had kept her monthly appointments at the mental health center for four months in a row. Ms. Jones stated that her previous problems were caused by her failure to take her medicine and said that she “understands” her medicine now and that she is taking it properly. However, when questioned more specifically, Ms. Jones stated that she takes her medicine only when she needs it, if she gets upset, jumpy or jittery. She said that she only takes the medicine about four times a month. All the medical testimony indicated that the medication has to be taken consistently, on a prescribed schedule, in order to be effective.

Ability to Provide a Home

The evidence presented at trial indicates that Ms. Jones was without a permanent home from about a month prior to the time her children were taken into custody until at least as late as April 28, 1988, when she was evaluated by Dr. Maumus, who noted that she was living with her brother and sister-in-law at the time. Ms. Boutin, Ms. Jones’ case manager with the Office of Child Services, testified that she had never had an address for Jones until she moved to an apartment in July of 1988. Patricia Mitchell, Ms. Jones’ case manager from June of 1986 until October of 1987 testified that Ms. Jones lived with her sister for a while after her release from Southeast. Ms. Jones later reportedly lived with friends and/or in the stairwell in the Fischer Housing Project for some unspecified period of time. When she testified on January 20, 1989, Jones submitted pictures of an apartment, located in Gretna, where she claimed to live. Ms. Boutin testified that Ms. Jones moved to an apartment at 918 Milton in Gretna in July of 1988.
Additionally, Ms. Jones’ employment history is confusing. Several of the psychological evaluations indicated that Ms. Jones claimed to have held jobs in the past which she could not have held. In her own testimony, Jones stated that she had enrolled in a nursing assistant’s program at the American College on the Westbank in April in 1988, but there was evidence that she missed 16 days of classes in April and was put on probation in May. She stated that she worked as a nurse’s assistant for a while, but she later had to quit pursuing *669 the program either because she was pregnant or because she hurt her back; her testimony was inconsistent. When she testified on January 20,1989, Ms. Jones stated that she had been working about four hours a day at a “cosmetology place.” She presented no evidence to corroborate any of her claims concerning employment, although she did have some certificates from the American College.
As further evidence of her alleged reformation, Ms. Jones claimed that at the time of trial, she was involved in a stable relationship with the father of her third child and that they planned to marry as soon as he could get his birth certificate. There was, however, some confusion concerning the boyfriend’s name. Ms. Jones stated that the boyfriend, who she called “Casey,” helped her pay for the apartment. She stated that Casey gave her various amounts of money every week, depending on the weather, since he is a contractor. She presented no evidence to verify Casey’s employment. Additionally, Casey did not testify.

Sufficiency of Evidence

As noted, the State bears the burden of proving by clear and convincing evidence either that there is no substantial indication of reform and that Ms. Jones is unlikely to reform, LSA-R.S. 13:1601(B), or that there is no reasonable expectation of reformation on Ms. Jones’ part, LSA-R.S. 13:1601(D). We believe that the evidence presented at trial was sufficient to meet that burden and that the evidence presented by Ms. Jones was insufficient to overcome the State’s case. Certainly the evidence shows that Ms. Jones never took any positive steps to improve her life prior to the filing of the petition to terminate her parental rights on February 12, 1988, some 29 months after the children were removed from her custody on September 23, 1985. The evidence is conclusive that Ms. Jones did not change her lifestyle. All experts agree that Ms. Jones is unfit to care for her children and will continue to be unfit for an indefinite period of time.
Since the State carried its burden of proving by clear and convincing evidence that there is no significant substantial indication of reformation and that reformation is unlikely, all the elements for termination under LSA-R.S. 13:1601(B) have been fulfilled. Thus, the juvenile court’s judgment terminating Ms. Jones’ parental rights must be upheld. However, since termination of parental rights is such a harsh and permanent action, we will also address Ms. Jones’ other assignment of error, that the State failed to prove that it has made every reasonable effort to reunite Ms. Jones with her children.
REASONABLE EFFORTS TO REUNITE
LSA-R.S. 13:1601(D)(4) places the burden on the State to prove that it made every reasonable effort to reunite the parent and children prior to termination of parental rights. In the instant case, we find that the State met its burden on this issue with the required clear and convincing evidence.
At trial, Ms. Jones’ case manager, Ms. Boutin, testified that she never had current addresses on Ms. Jones and that she had great difficulty contacting her. This testimony was corroborated by Ms. Mitchell, the previous case manager, who stated that Ms. Jones never made any attempts to visit her children between June of 1986 and January of 1987. Two visits were conducted in January of 1987 and March of 1987, then the visitation was terminated by a juvenile court judge because the children were frightened by Ms. Jones’ actions. Ms. Boutin stated that Ms. Jones had no contact with the children from the time she became case manager in October of 1987 until the time of trial in late 1988.
Ms. Jones argues that the State should have made greater efforts to reunite her with her children, despite the difficulty in making contact with her. In oral argument to this court, Ms. Jones claimed that she was consistently available under the subpoena power of the court. However, a review of the record reveals at least three instances when subpoenas to Ms. Jones were returned undelivered because she could not be located.
*670 Although the State has an affirmative duty to attempt to reunite families, it has no duty to make constant, repeated efforts to involve a parent who has shown no interest in having her family reunited. We find that the evidence presented by the State was sufficient to meet its burden of proof; essentially, Ms. Jones presented no evidence in rebuttal. Thus, all of the elements for termination of parental rights under LSA-R.S. 13:1601(D) are present.
CONCLUSION
For the above and foregoing reasons, the juvenile court judgment terminating Vanessa Jones’ parental rights to Nikill and Charmaine Jones and freeing the children for adoption is affirmed.
AFFIRMED.