706 So.2d 688 (1998)
STATE of Louisiana in the Interest of LATOYA W. and her siblings.
No. 97-CA-0695.
Court of Appeal of Louisiana, Fourth Circuit.
February 4, 1998.
*689 Montu R. Bashambu, Student Attorney, Catherine Henderson, Student Attorney, Claire T. Kane, Student Attorney, George Chaney, Jr., Supervising Attorney, David Katner, Supervising Attorney, Tulane Juvenile Law Clinic, New Orleans, for Appellants the minor children, Latoya W. and her siblings.
F. Clayton Latimer, Department of Social Services, Bureau of General Counsel, New Orleans, for Appellant the State of Louisiana, Department of Social Services.
Catherine L. Lafleur, Loyola Law Clinic, New Orleans, for Appellant Larry B., Father.
Cynthia D. Samuel, New Orleans, for Appellee Stephanie W., Mother.
Before KLEES, WALTZER and MURRAY, JJ.
MURRAY, Judge.
This appeal requires us to review a Judgment of Termination rendered by the Juvenile Court on July 8, 1996, clarified and amended on April 3, 1997, that determines the fate of seven minor siblings. The children are:
Latoya W., age 12. Latoya, who was born January 27, 1985, to Stephanie W. and Johnell M., came into state custody on January 25, 1991, when she was 6 years old. She was placed in a certified foster home.
Kelly W., age 10. Kelly, who was born January 31, 1987, to Stephanie W. and Larry B., also came into state custody on January 25, 1991. She was 4 years old, and was placed in the same certified foster home as Latoya.
Larry W., age 10. Larry was born on October 29, 1987, to Stephanie W. and Larry B. He was 3 1/2 when he came into state custody on January 25, 1991. He was placed in the same foster home as Latoya and Kelly.
Ashley W., age 8. Ashley was born on November 14, 1989, to Stephanie W. and Larry B. Like her older siblings, she has been in state custody since January 25, 1991. She was 14 months old when she was placed in a certified foster home with her older siblings.
Diannie W., age 7. Diannie was born on October 13, 1990, to Stephanie W. and Larry B. She also came into state custody on January 25, 1991. She was 3 months old when she was placed in the care of the sister-in-law of her older siblings' foster mother.
Leonard W., age 6. Leonard was born on September 1, 1991, to Stephanie W. and Larry B. He came into state custody on November 18, 1991, when he was two months old. He was placed in a certified foster home.
Dione W., age 5. Dione was born on December 29, 1992, to Stephanie W. and Neil M. When she was 2 months old she came into the custody of the State, and was placed in the same foster home as Leonard.
*690 The Juvenile Court judgment terminated the parental rights of Stephanie W., Johnell M., Larry B., and Neil M., and freed and made eligible for adoption all seven children. The judgment, however, placed conditions on the adoption of Latoya, Kelly, Larry, Ashley and Diannie (referred to by the parties at various times as the "older" children). Specifically, the court ordered that Latoya, Kelly, Ashley and Larry could only be adopted together, and that Diannie could only be adopted on the condition that she be permitted weekly visits with her siblings. No conditions were placed on an adoption of Leonard and Dione.
Latoya, Kelly, Larry, Ashley and Diannie appeal the termination of their parents' rights. Larry B., the father of Kelly, Larry, Ashley, Diannie and Leonard appeals the termination of his parental rights. The State of Louisiana through the Department of Social Services appeals the portion of the judgment that placed conditions on the adoption of Latoya, Kelly, Larry, Ashley and Diannie. Stephanie W., the childrens' mother, does not appeal the termination of her parental rights. She, however, has answered the State's appeal as to the conditions placed on her childrens' adoption.

DISCUSSION:

A. Termination of Parental Rights:
The grounds for involuntary termination of parental rights are set forth in Article 1015 of the Louisiana Children's Code, which provides that the grounds set forth in the petition for termination must meet all of the conditions of any one of the enumerated paragraphs. The State was required to prove the grounds for termination by clear and convincing evidence. La.Ch.C. art. 1035. Although only one ground for termination need be established, the court also must find that termination is in the best interest of the child. La.Ch.C. art. 1039; State in Interest of ML, 95-0045, p. 4 (La.09/05/95), 660 So.2d 830, 832; State in the Interest of D.G. v. Danny G., 30,196-CA (La.App.2d Cir. 10/29/97), 702 So.2d 43.
Although the State petitioned to terminate the parental rights of Stephanie W. and Larry B. alleging grounds under art. 1015(4) and/or 1015(5), 1015(4) is not applicable to this case as these children had been removed from the parental home. See State in the Interest of S.C. v. D.N.C., 26,104-JA (La. App. 2 Cir. 6/22/94), 639 So.2d 426, writ denied, 94-1977 (La.11/4/94), 644 So.2d 1061. We, therefore, consider the termination of the rights of Stephanie W. and Larry B. under sec. (5) of art. 1015.
The first condition that the State was required to prove was that more than one year had elapsed since each child was removed from parental custody pursuant to a court order in a child in need of care proceeding and placed in the custody of an agency or an individual. La.Ch.C. art. 1015(5)(a). That condition was satisfied as to each child: the five eldest children, who were removed from their parents' custody on January 25, 1991, were formally adjudicated children in need of care on May 29, 1991; Leonard was removed from parental custody and adjudicated in need of care in November of 1991; and, Dione, placed in foster care in February of 1993, was adjudicated in need of care in May of that year; the petition for termination was filed on March 7, 1994.
We also find that the State proved by clear and convincing evidence that Stephanie W. was unfit to retain parental control and that there was no reasonable expectation of her reformation in the foreseeable future. La.Ch.C. art. 1015(5)(b).
"Unfit" is defined at La.Ch.C. art. 1003(10). Subsections (b) and (c) of that article, which are relevant to this case, define as unfit a parent:
(b) Who has consistently refused to provide reasonably necessary food, clothing, appropriate shelter, or treatment .... Financial inability alone shall not constitute grounds for termination of parental rights.
(c) Whose medical or emotional illness, mental deficiency, behavior or conduct disorder, severe physical disability, substance abuse, or chemical dependency makes the parent unable or unwilling to provide an adequate permanent home for the child at the present time or in the reasonably near future based upon expert opinion or based upon an established pattern of behavior.
*691 Stephanie W.'s testimony established that she was unable to care for her children and that it was not reasonably foreseeable that she would be likely to care for them in the near future. She testified that her children had remained in foster care for five years because she was incapable of caring for them because of her crack cocaine habit. Stephanie has been in and out of various drug treatment programs, but has not been able to stop using drugs. She admitted to prostituting herself and stealing from her mother and aunts and even stealing her children's Christmas toys to secure money for drugs. Although Stephanie testified that she loves her children and looks forward to her weekly visits with them, she has missed visits because she was "hung out" from drug usage. Finally, she admitted that she has no source of income and no place to live, even if she were to kick her drug addiction. The second condition for termination of Stephanie's parental rights was satisfied by the State.
We also find that the State proved by clear and convincing evidence that Larry B. was unfit and that reformation was not likely in the foreseeable future. Larry has never provided any of life's necessities for his five children. He was convicted of auto theft in 1986, shoplifting in 1989, unauthorized entry of an inhabited dwelling in 1992, for which he was sentenced to three years[1], and manslaughter in 1994. At the time of this trial, he was still serving that sentence. Larry testified that all of his criminal activity was related to his substance abuse problems. He admitted that his children were in foster care because of his and Stephanie W.'s drug addictions. He began smoking marijuana at age 15 and progressed to cocaine at age 20. Although Larry testified that he has been drug free since 1993, he admitted that once released from prison, he would want to live away from the New Orleans area to avoid the same pitfalls and temptations that landed him in jail in the first place. He testified that he would have to live with his mother upon release from prison because he had no other place to live.
Larry B. contends that the State, which chose to prove him unfit as defined by La. Ch.C. art. 1003(1)(c), failed to carry its burden because it did not show that he was using drugs at the time of trial or to refute his testimony that he has been drug free since 1993. This argument overlooks the fact that the State alleged that he also was unfit due to conduct related to his substance abuse. See La.Ch.C. art. 1003(10)(b). By his own admissions, Larry's inability to provide for his children and his criminal activity were directly related to his drug use. His children have been in foster care since 1991, but Larry has made no genuine effort to assume responsibility for his children. He was incarcerated during a large part of the time period involved, and there was testimony that he never requested visits with his children, even when he was in New Orleans for hearings on this matter. Larry B. admitted that he knew how to contact his children but did not attempt to do so until his attorney in this case encouraged him. Larry testified that he would have to rely on relatives once released from prison, and that he would have to get his own life together before he could consider taking responsibility for his children.
Factual findings as to a parent's fitness to rear a child, whether a significant substantial indication of reformation has been shown, and whether the parent is likely to reform, will not be set aside absent manifest error. State in Interest of BJ, 95-1915, p. 15-16 (La.App. 1 Cir. 4/4/96), 672 So.2d 342, 351, writ denied, 96-1036 (La.5/31/96), 674 So.2d 264. Based on the record before us we cannot say that the trial court's determination that Larry B. was unfit and unlikely to reform was manifestly erroneous.
The final condition for termination under La.Ch.C. art. 1015(5) is that the State must have made every reasonable effort to reunite the child with his parents to no avail, and that it now recommends that reunification would not be in the best interests of the child.
Karen Pierce, Foster Care Case Manager for the Office of Community Service, testified that she was first assigned to this case in June of 1992. She understood from the case *692 file that the five eldest children came into State custody when Stephanie W. and Larry B. entered a drug rehabilitation center, that Leonard came into State custody when Stephanie W. and Larry B. stated that they were unable to care for the boy because they were involved in drug usage and required drug treatment, and that Dione, who was chemically dependent at birth as a result of Stephanie W.'s crack cocaine use, came into State custody at about five weeks old. When Ms. Pierce became involved in the case there had already been one administrative review with an attempt to work out a case plan for the children. She explained that family members and foster parents are invited to attend these reviews. At that review, the problems associated with the case were the parents' drug use and need for rehabilitation, lack of adequate housing, and poor parenting skills. It was Ms. Pierce's understanding that Larry B. was incarcerated at that time.
A second case staffing took place in August of 1993. The staff decided to work with Larry B. in an attempt to place the children with him. Larry B. enrolled in the New Orleans Substance Abuse Clinic at that time and visits with the children were arranged. However, Larry B. missed several of the visits between July and mid-September, and was arrested, convicted and sentenced to prison on a charge of manslaughter by October of 1993.
A third case staffing was held in January of 1994. At that time it was determined that termination of Stephanie W.'s and Larry B.'s parental rights would be in the best interest of the children. An adoption specialist, whose role it is to make suggestions on the feasibility of adoption, was present.
Two more case staffings were conducted in 1996. At the earlier one, Dr. York, a child psychologist who had been treating the elder children, was present. At the latter one, adoption unit personnel were again present. Both case staffings again ended with recommendations for termination of parental rights. Shortly after the last case staffing, the lower court ordered that a psychological evaluation of Stephanie W. be conducted. She missed the first appointment, showed up late for the second, and missed the third.
Stephanie W., although fairly regular in attending the scheduled visits with her children at the OCS office, admitted that she had not completed drug rehabilitation programs that OCS had arranged for her. She testified that she knew she would not get off drugs until she made up her own mind to do so. She admitted that she had not held any type of job since 1987, and that she had no place to live at the time of the hearing.
Ms. Pierce testified that all possible avenues for placement of the children with a relative were explored and found to be unsuitable. The known possible relatives either had substance abuse problems of their own, or were already caring for other family member's children.
While the State has an affirmative duty to reunite families it is not required to continue it efforts to do so indefinitely. La.Ch.C. art. 1015(5)(c); and see State in Interest of BJ, supra at p. 15, 672 So.2d at 350; State in Interest of Jones, 567 So.2d 664, 669 (La.App. 4 Cir.1990). The State demonstrated that it has made a diligent effort to reunite these children with their parents, but, despite its best efforts, it has failed. We agree with the trial court that the final condition for involuntary termination has been proven by clear and convincing evidence.
The five older children argue, however, that the trial court erred when it terminated their parents' rights because the evidence established that it is in their best interest to continue to have contact with their parents, particularly their mother, and with one another. They contend, therefore, that permanent foster care with their respective foster families, not termination, is in their best interest.
Although the record clearly establishes that the four older children have a bond with their mother and one another as well as Diannie, the experts disagreed as to whether termination of parental rights was in these children's best interest.
The four older children testified that they loved their mother and their siblings. Each testified that he or she wanted to continue *693 living in the current foster home with his or her siblings and to be able to visit with Stephanie W. Latoya testified that the thought of losing contact with her mother or siblings made her angry, while the other children testified that this loss would make them sad.
Dr. Victoria Snyder, a doctor with fifteen months of experience in working with children, testified on behalf of the five older children. Dr. Snyder, who was in her second year of a child psychiatry fellowship at Tulane, observed the five older children and Stephanie for approximately 40 minutes during a visit at the office of OCS and approximately 5 minutes in the waiting room at Tulane. She also interviewed each of these five children individually on one occasion. She testified that each interview lasted approximately 25 to 30 minutes. Based on her interviews and her observations, it was her opinion that parental rights not be terminated as preservation of those parental rights was necessary in order to preserve the siblingship and the family unit, which she believed to be essential to the children's well-being and development. It was her opinion, therefore, that the children's best interest would be served by maintaining them in permanent foster care until they were adults.
Dr. York, a licensed child clinical psychologist practicing in Louisiana since 1977, testified that he had been working with the four older children in sibling therapy on a weekly basis since 1993. He also had worked with Latoya and Kelly in individual therapy for a limited period of time, and had begun individual therapy with Larry shortly before the termination hearing.
Dr. York detailed the progress that each of these four children had made since beginning therapy. He testified that the children had no hopes of being reunited with their mother, nor did he think that they perceived of her as a parenting resource. He also testified that Stephanie, who had been fairly consistent in visiting the children, had shown her love for her children by these visits, which she had made as pleasant as possible, and that she was to be credited for having done so. Like Dr. Snyder, he expected the children to be adversely impacted by the changes that would likely result from termination of Stephanie's parental rights, including no longer being able to visit with her and the possibility of losing contact with one another. However, it was his opinion that there were things that could be done to soften the trauma of termination.
It also was Dr. York's opinion that it would be very hard for these children to make decisions that involve changing their lives, so that this would have to be an adult decision. As he explained, "I don't think that they have the cognitive awareness to know what alternatives might be available to them and what those would mean." Dr. York testified that it was in these children's best interest that they be freed for adoption. He acknowledged that the determination of the children's best interest would be more problematic if they were not all adopted, and that his opinion would be impacted if he knew that these children were never going to be adopted. However, he saw nothing about these children, who he found to be delightful, both individually and as a group, that would make them "not adoptable." He testified that: "They are attractive physically; they don't have major behavioral problems; they are very personable."
Dr. York was asked if the children's interest would be better served by being freed for adoption or long term foster care in their current situation. He responded that "[T]he current situation is good. It's probably the best foster care situation that I have known. But it is a foster care situation, and my concern is that at some point it will not be there." He affirmed his opinion that giving the children the opportunity to be adopted would be in their best interest, even knowing that their current foster parents would not adopt them. Although Dr. York recognized that there were no absolute guarantees to a permanent family relationship with an adoptive parent, he pointed out that it was certainly a lot harder to give back children who had been adopted than it was those in foster care.
Unfortunately, neither the experts, the trial court, nor this court has a crystal ball that can show us what the future holds for these children. There are no easy answers and no *694 "guarantees" in a case such as this. The trial court apparently gave greater weight to Dr. York's opinion than it did to the opinion of Dr. Snyder. Based on the relative general experience of the two experts as well as their specific experience with these children, we cannot say that the court was manifestly erroneous when it concluded that termination and being freed for adoption, as recommended by Dr. York, rather than permanent foster care, as recommended by Dr. Snyder, was in these five children's best interest.

B. Conditions on Adoption:
The State's sole assignment of error addresses the conditions placed on the adoption of the five eldest children by the juvenile court. The State contends that the court was without legal authority to require that the four oldest children must be adopted together and that they and Diannie have reciprocal visitation rights. The State argues that Louisiana law, with very limited exceptions, provides for a complete severing of all ties between an adopted child and its biological family. It contends that the trial court's order, which attempts to expand those limited exceptions, impedes the establishment of a new legal family, which it argues is the purpose of adoption.
We agree. Louisiana Children's Code article 1038 establishes that "[a] final judgment terminating parental rights relieves the child and the parent against whom the judgment is rendered of all of their legal duties and divests them of all of their legal rights with regard to one another...". The effects of a judgment of termination pursuant to art. 1038 are the same as those of an adoption decree under La. Civ.Code art. 214. See La.Ch.C. art. 1038, 1991 Official Comment.
Louisiana Civil Code article 214 C provides that "upon adoption: the blood parent or parents and all other blood relatives of the adopted person, except as provided by Ch.C. Article 1264, are relieved of all of their legal rights with regard to the adopted person,..." (emphasis added). La.Ch.C. art. 1264 allows for limited visitation rights for grandparents.
In support of the conditions placed on her older children's adoption, Stephanie W. argues that the trial court was correct to impose those conditions on the adoption of the five eldest children because the evidence established that it is in their best interest to have continued contact with each other. She points out that recent legislation allows for continued contact between a child and a parent, sibling, or other biological relative subsequent to termination of parental rights.
Louisiana Children's Code article 1037.1, the legislation to which Stephanie W. refers, does not provide for continued contact after adoption. This article, which allows continued contact between the biological parents and the children after parental rights have been terminated, provides that such contact will cease upon the children's being placed in a permanent home through adoption. This legislation may indicate the Legislature's recognition that abrupt termination of all contact between biological parent and child may not always be in the child's best interest. It, however, is not authority for the conditions imposed by the trial court in this case. In fact, it would appear to expressly prohibit such conditions by providing for termination of contact upon the child's being placed for adoption.
The issue of sibling visitation is a troubling one, particularly where, as here, the evidence establishes that a strong bond exists between siblings. This Court addressed that issue in State in the Matter of the Adoption of "Deborah", 95-2545 (La.App. 4 Cir. 9/18/96), 681 So.2d 22. Faced with conflicting recommendations regarding continued contact between a 16-year-old boy and his 6-year-old half-sister who had been adopted by a maternal aunt and uncle, this Court affirmed the judgment discontinuing all visitation between the siblings. Although acknowledging that expert testimony regarding the adopted child's best interests could be considered by the juvenile court, the court found that the expert recommendations could only be applied within the constraints of the law. Adoption of Deborah at p. 5, 681 So.2d at 25.
We recognize the significant upheaval to which these children, particularly the five older children, have been exposed during *695 their short lives. The evidence establishes that they have been extremely fortunate in foster care situations, which have allowed them to maintain a relationship with one another. As the four older children's foster mother testified, she and these children "are a family." It is understandable that the children will resist any action that may deprive them of their "family." The trial court's attempt to impose some semblance of stability in their lives by placing conditions on their adoption is understandable and commendable. However, Louisiana law does not allow for the imposition of such conditions on adoptions. Although the court may order a transition plan that allows for continued contact, that contact must be in accord with La.Ch.C. art. 1037.1, and must cease upon placement for adoption.

CONCLUSION:
For the foregoing reasons, the portion of the judgment placing conditions on the adoptions of Latoya, Kelly, Larry, Ashley, and Diannie is vacated. The judgment is affirmed in all other respects.
AFFIRMED AS AMENDED.
NOTES
[1] He served 18 months on the sentence.