L MURRAY, Judge.
This is an appeal from a juvenile court judgment terminating parental rights. For the following reasons, we affirm the trial court’s judgment.
FACTS AND PROCEDURAL HISTORY
D.C. is the mother of D.O.C., a son born on October 4, 1989, A.M.C., a daughter born on December 31, 1990, and L.A.C., a daughter born on January 6,1993.[1]
D.O.C. and A.M.C. were placed in the custody of the State of Louisiana, Department of Health and Human Resources, Office of Community Services (“OCS”), in Orleans Parish on June 30, 1992. Based on reports from the OCS, the State’s petition asserted that: D.O.C. and A.M.C. were neglected and dependent children because D.C. left them with T.L. and had not returned; D.C. was arrested for prostitution, loitering, and unauthorized use of a movable; T.L. said he could not take care of the children; the children’s home had no water or electricity; the children were filthy; A.M.C. had diluted, spoiled milk in her bottle, and the | ..children had healing *228 loop marks consistent with extension cord beatings and various other marks and bruises.
On September 3, 1992, the trial court adjudicated D.O.C. and A.M.C. children in need of care and the OCS placed them in foster care. The trial court concurred in the State’s case plan for reunification of the children with their parents, but ordered the parents to participate in parenting classes, substance abuse counseling and random screenings, and to obtain adequate housing.
In judgments of January 27, 1993, August 30, 1993, and March 9, 1994, relative to D.O.C. and A.M.C., the trial court found that reunification of the family was not feasible due to the inability and/or unwillingness of the parents to provide proper care and/or the incarceration of the parents. The January 1993 judgment ordered special conditions for D.C., including her participation in substance abuse counseling, drug screening, and Narcotics Anonymous. The August 1993 judgment noted D.C.’s failure to visit her children and her failure on evaluations, and warned that D.C.’s failure to comply with the special conditions would result in the termination of her parental rights. The March 1994 judgment noted the trial court’s concurrence with the OCS plan for termination of parental rights as to D.C., noting “[D.C.] has not done anything she was ordered to do.”
Meanwhile, L.A.C. was placed in State custody on August 3, 1993. The State’s petition asserted that D.C. left L.A.C. with a babysitter and was subsequently arrested and incarcerated, and L.A.C.’s father, T.L., was incarcerated; that L.A.C. had suffered a cigarette burn on her arm, her home had no electricity, and she had a bad scalp condition and possibly an ear infection. The trial court adjudicated L.A.C. a child in need of care on November 8, 1993, and the OCS ^placed her in foster care. The trial court adopted a case plan for reunification of L.A.C. with D.C., requiring D.C. to participate in parenting and substance abuse programs and to secure housing.
In judgments of May 3, 1995 and September 16, 1996, relative to D.O.C. and A.M.C., the trial court reiterated its concurrence with the revised OCS plan for termination of D.C.’s parental rights, again ordering D.C. to comply with all previous court orders.
In a judgment of March 6,1998, the trial court, noting that D.C. was incarcerated, removed D.O.C. and A.M.C. from foster care and placed them in the custody of their aunt in Concordia Parish, Louisiana.[2] Their case was placed on inactive status in Orleans Parish.
From 1993 to 1998, L.A.C. remained in foster care around New Orleans, as did D.O.C. and A.M.C., until she too was placed in the custody of the same aunt in August 1998. L.A.C.’s case was then placed on inactive status in Orleans Parish.
On March 17, 1999, the children returned to State custody in Orleans Parish after their aunt was arrested. After the Concordia Parish court adjudicated the children in need of care, the case was transferred back to Orleans Parish, reopened, and consolidated.
The OCS attempted to locate D.C. from May 1999 to September 1999, with no success. D.C. eventually contacted the OCS in September 1999 from Orleans Parish *229 Prison, where she had been incarcerated since July 1999.
In a judgment of January 11, 2000, the trial court noted that D.C. had not been in substantial compliance with court orders and the case plan for ^reunification. In a judgment of July 13, 2000, the trial court concurred with the OCS plan of termination of parental rights. Again, the court noted that D.C. had been in total noncompliance with court orders and the case plan for reunification.
The State filed a petition for termination of parental rights and certification of the children for adoption on August 17, 2000. In its petition, the State alleged that D.C. made no substantial compliance with the OCS case plan and that there was:
... no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the age of the children and their need for stable and permanent homes, as evidenced by the mother’s long history of substance abuse, her frequent incarcerations, and her failure to participate in recommended substance abuse treatment and other services or to otherwise comply with the case plan adopted by the agency and approved by the Court.
After a trial on October 26, 2000, the trial court rendered judgment terminating all parental rights and obligations of D.C. relative to her children, D.O.C., A.M.C., and L.A.C.[3] D.C. appeals this judgment.
At trial, the State presented testimony of four OCS ease workers. D.C. and T.L. also testified.
Suzanne Johnson, A.M.C.’s case manager, testified that she received the case in May 1999, when the children returned from Concordia Parish. Johnson testified that she attempted to locate D.C. at a Metairie, Louisiana address from May to September of 1999. She testified that she spoke to D.C.’s boyfriend, Kenneth Sanders; twice at this address, and he initially told her that D.C. did not live there, but later revealed that D.C. was in jail.
| Johnson testified that D.C. contacted her from jail, precipitating her discussions with D.C. about the case plan for the children. Johnson testified that D.C. expressed love for her children and sorrow about her past substance abuse, which the OCS reports showed was seven years in duration, and said that she was finished with drugs. Johnson stated that beginning in December 1999, D.C. expressed her wish that her children be placed in the home of her boyfriend, his mother, and her youngest daughter. Johnson testified that a home study determined this home was physically adequate and that Sanders’s mother wanted D.C.’s children to live there.
Johnson further testified that test results indicated that D.C. was using drugs when she lived with Sanders. Johnson stated that she has an unspecified record of D.C.’s past participation in drug programs, as well as reports of random incarcerations of D.C. from 1993 to 1999. Johnson testified that she thought D.C. was to be released from jail in April 2001, but that D.C. reported to her that she could be released in February 2001 because she had obtained her GED while in jail.
Johnson testified that she received seven letters from D.C. from September 1999 to June 2000. Johnson testified that during this time period, D.C. also sent several cards and notes for her children, as did *230 Sanders. All of this correspondence was introduced into evidence at trial.
Johnson testified that D.C. no doubt loves her children, has positive intentions for the future, and has, since September 1999, been trying to satisfy the case plan, notwithstanding her incarceration. Johnson stated that D.C. told her | fithere was no drug program in jail. Johnson testified that she had no reports of physical abuse of the children by D.C. or Sanders.
Regarding A.M.C., Johnson testified that A.M.C. was in her second placement in the same foster home, and A.M.C. is happy and adjusted in this home. Johnson stated that A.M.C.’s foster mother is interested in adopting A.M.C., and, although A.M.C. is not clear about what adoption is, she did indicate that she wanted to stay where she was. Johnson stated that A.M.C. has had no contact with D.C. since May 1999, other than the correspondence D.C. sent.
Stephanie Gomez, the OCS case worker for D.O.C. since July 2000, testified that D.O.C. has lived at McDonald Methodist Children’s Home in Houma, Louisiana since April 1999. Gomez testified that D.O.C. is doing very well there, and that as of September 2000, the OCS recommendation for D.O.C. has been a less restrictive placement, i.e., in foster care. Gomez stated that D.O.C. has had behavioral and emotional problems for which he has been treated with medication. Gomez testified that D.O.C. is enrolled in a special education program and requires on-going counseling for his problems.
Gomez testified that D.O.C. said he does not want to live with his mother, that he has had no personal contact with D.C. or Sanders since May 1999, and that he is very excited about the possibility of being adopted.
Antonio Condley, L.A.C.’s case worker since April 2000, testified that L.A.C. has lived at the same foster home from April 1993 to January 1998, and again from May 1999, until the day of trial. Condley testified that L.A.C. is currently in counseling for anger management, peer relations, and respect for authority, and that the OCS recommendation for L.A.C. is adoption. Condley |7testified that he has spoken to L.A.C. about the future and that she expressed her desire to stay where she is. Condley testified that L.A.C. never gave an answer when he asked her if she wanted to live with her mother.
Willistine Crier, the OCS case manager for D.C.’s family from March 1996 until the children were placed with their aunt, testified that during the time she was involved in the case, D.C. was never rehabilitated from drug usage. Crier testified that the case plan for the family changed from reunification to termination to custody with a relative (the aunt in Concordia Parish). Crier testified that D.C. was pleased with the plan of custody with a relative. Crier testified that she reported to the trial court in December 1997 that D.C. was back in jail and had not visited her children since January of 1996. Crier testified D.C. was in jail during 90% of the time Crier was the case manager for the family. Crier further testified that when D.C. was not in jail, she did not participate in drug treatment programs; nor did she have stable housing.
Crier testified that upon her release from prison, D.C. lived with her children in Concordia Parish and disrupted their placement there.
D.C. testified that her greatest wish for when she is released from prison is “to obtain [her] sobriety and to be reunited with [her] children.” D.C. testified in detail about the various positive goals she has set for herself after she is released and *231 stated that during her incarceration she has served as a “tier rep,” which means she was responsible for serving food to the women in her prison dorm. D.C. testified that she is no longer the person she once was. She testified that she has been incarcerated four different times.
|SD.C. testified that she would like her children to live with Sanders until she is released from prison. She testified that she intends to marry Sanders and that she and Sanders lived with her children at her sister’s home in Concordia Parish in 1998. D.C. testified that Sanders is currently on probation for his conviction of writing bad checks in Concordia Parish.
D.C. testified that within six months of her release from prison she should have “[herjself together.” D.C. testified that she would be released in April 2001 or February 2001, depending on her receiving credit as anticipated for completion of an educational program.
T.L. testified that he has known Sanders for eight years and has no problem with his children being placed in Sanders’s custody.
DISCUSSION OF LAW
Giving reasons for his decision to terminate D.C.’s parental rights, the trial court’s stated:
... I am totally discounting any information concerning Mr. Sanders’ rap sheet, other than what we heard about the conviction for bad checks.
The Court was impressed with the sincerity of D.C. in her present situation. The Court believes that in her present situation, she is intending to do the right thing when she is released. However, the Court has to look at the law and make a determination as to whether or not the State has proven by clear and convincing evidence that there is no reasonable expectation of significant improvement by D.C. Just because she says it, doesn’t mean it is going to happen. This Court has heard and D.C. has admitted that she has been a crack addict, that she has been non-compliant with the case plan. The Court appreciates her admissions and her candor in that respect. But it was because of that addiction and because of the non-compliance that we are here today. The Court has also heard that D.C. has been in other rehab programs or tried some of them for some period of time and left those programs. There is no guarantee, despite her testimony that she wants to do the right thing, that she is going to do the right thing. 119don’t really have a reasonable expectation that she will. Only that she desires to, not that she will.
The Court finds that the State has proven by clear and convincing evidence that due to D.C.’s addiction and noncompliance with the case plan, that there is no reasonable expectation of significant improvement, and also notes there was a period of time, I think it was in early 1999, when she was not incarcerated, for some reason she just couldn’t find her way to the O.C.S. office; she couldn’t find her way to court to make inquiries, to try to contact the attorneys who have represented her.
There were many things that she could have done and she did none of that. I think that is because of her addiction and noncompliance. [D.C.], I hope for your sake and for the sake of your youngest child, who is not in state’s care, that you have made that change. If you haven’t, you might find yourself back in court again concerning her. I hope that doesn’t happen. The Court also finds that T.L. is not only incarcerated 15 years, commencing January [2000], but that he has been in and out *232 of jail. Even when he was not in jail, he made no provision, whatsoever, for his child[ren], When D.C. was out of jail, she made no provision for the children.
The Court finds that [T.L.] has not only not worked the case plan, but the State has proven by clear and convincing evidence, under the legal definition of abandonment, abandoned his children.
The Court also finds that it is in the best interest of the children that parental rights be terminated.
[[Image here]]
D.O.C., who is 11 years old, says that he doesn’t want to live with mom because she is always going to jail and she is always on drugs. That is his only memory of mom at this point in time.
L.A.C., who is only l}fi years of age, although she doesn’t understand what adoption is, knows that she would rather stay where she is rather than be returned to mom.
A.M.C., who apparently had even less of an understanding of what adoption meant, said she wanted to stay where she was and maybe write some letters to mom. The attitude of the children is related directly to the behavior of the parents in them not being there for the children.
At this time, the Court does terminate the parental rights of D.C. and T. L.
| In State in the Interest of S.M.W., et al., 00-3277, pp. 8-10 (La.2/21/01), 781 So.2d 1223, 1232-33, the Louisiana Supreme Court recently set forth the proper analysis for the standard of review and burden of proof in a case involving the termination of parental rights. The court stated:
As recognized by the United States Supreme Court, “[t]he liberty interest in this case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court.” Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). After reviewing its own jurisprudence, the Court stated, “[i]n light of this extensive precedent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.” Id.
Recognizing this interest, this Court has held:
The State’s parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the *233 permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is Ingrievous, perhaps more so than the loss of personal freedom caused by incarceration.
State ex rel. J.A., 99-2905 (La.1/12/00), 752 So.2d 806, 811-12 (cites omitted).
Title X of the Children’s Code governs the involuntary termination of parental rights. As applicable to this case, the grounds for termination of parental rights are:
(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.
La. Children’s Code Art. 1015(5). The method of proving these elements is provided in La. Children’s Code Art. 1086. La. Children’s Code Art. 1036(C) and (D) provide:
(C) Under Article 1015(5), lack of parental compliance with a ease plan may be evidenced by one or more of the following:
(1)The parent’s failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(D) Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
|12(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
*234 The State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Children’s Code art. 1035(A); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence); State ex rel J.A., supra at 811. The State must only establish one statutory ground for termination, but the trial judge must also find that termination is in the best interest of the child. La. Children’s Code art. 1039; State ex rel. J.A., supra.
“It is well-settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly wrong.” In re A.J.F., 00-0948 (La.6/30/00), 764 So.2d 47, 61. “Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court.” Id.; Rosell v. ESCO, 549 So.2d 840 (La.1989). “[I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Rosell, supra at 844. “Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.” Id. “In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court who is in the unique position to see and hear the witnesses as they testify.” In re A.J.F., supra at 62. “The trier of
fact is not disadvantaged by the review of a cold record and is in a superior position to observe the nuances of demeanor evidence not revealed in a record.” Id.
|13Therefore, in the instant case, the State had the burden of proving the elements of La. Children’s Code Art. 1015(5) by following the guidelines provided in La. Children’s Code Art. 1036(C) and (D). The trial court was required to find that the State had proven the required elements by clear and convincing evidence and also to find that termination of parental rights was in the best interest of the children.
In her appeal, D.C. argues that the State failed to prove the elements of art. 1015(5) by clear and convincing evidence. Although she concedes that her children have been in State custody for at least one year, D.C. claims that this was due, in part, to her incarceration and the OCS’s failure to place the children with Sanders as she wanted. Furthermore, D.C. contends that certain trial testimony indicated her compliance with the OCS case plan. Moreover, D.C. argues that her statement of her future intentions at trial, considering her current imprisonment, is sufficient to demonstrate a substantial indication of reformation by her.
In terminating D.C.’s parental rights, the trial court found that the State had proven the elements of article 1015(5). As D.C. admits, the children have been in the custody of the State for over one year. D.C.’s attempt to blame her current incarceration or the OCS for this situation because it failed to place the children with Sanders is specious, considering that the children were placed in State custody in 1992 or 1993.
The trial court also found that the State had proven the second element of art. *235 1015(5) — no substantial parental compliance with the case plan — finding that D.C. had admitted to being a drug addict and not complying with the case plan and |14had shown no desire to find out about her children or provide for them even when she was not in prison. D.C. points to testimony she claims shows her compliance with the case plan. Crier’s admission, however, that she reported in August 1997 that at some time before she took over the case (in March 1996), D.C. had completed a second inpatient substance abuse program, does not sufficiently show substantial compliance with the case plan, particularly in light of the abundant, un-eontroverted evidence that D.C. repeatedly failed to comply with the case plan, after numerous judgments ordered her to do so.
D.C. seems to argue that her current plans to reside with Sanders after her incarceration fulfills the case plan requirement for securing stable housing issued years ago. Likewise, D.C. appears to argue that her residing with her children in Concordia Parish for an unspecified amount of time fulfilled the case plan requirement for visitation. Neither of these arguments has merit. The only evidence about the children’s stay in Concordia Parish indicates that the placement proved disastrous for everyone involved. And, D.C.’s future plans regarding housing are simply plans — after eight years it is not unreasonable for the trial court to view D.C.’s intentions skeptically.
The trial court’s factual findings regarding the second requirement of article 1015(5) — no substantial compliance with the case plan — touch upon many of the factors listed in article 1036(C). Considering that the State must prove only one of these factors by clear and convincing evidence, the trial court’s findings were reasonable, supported by the record, and not manifestly erroneous.
D.C. contends that her accomplishments in her most recent incarceration and her statement regarding her goals and intentions for the future demonstrate 115fulfillment of the third element of article 1015(5) — a substantial indication of reformation. Although we agree that D.C. does not have to prove that all problems have been eliminated, she must show more than mere cooperation with the OCS. As the court stated in State in the Interest of S.M., et al., 98-0922, p. 10 (La.10/20/98), 719 So.2d 445, 450:
... we established the test in State in Interest of L.L.Z. that “a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shovm improvement, although all of the problems that exist have not been eliminated.” 620 So.2d at 1317 (emphasis added). Utilizing our statement in State in Interest of L.L.Z. as a springboard for elaboration, several appellate courts have held that “reformation” means more than mere cooperation with agency authorities. More importantly, reformation of the parent is shown by a “significant, substantial indication of reformation ... such as altering or modifying in a significant way the behavior which served as a basis for the state’s removal of a child from the home.” ... Furthermore, the jurisprudence has held that “[a] parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated.... In reviewing the appellate courts’ treatment of reformation since we rendered Stale in Interest of L.L.Z., we find that their elaboration is fully in accordance with our ruling and our application of that pronouncement to the facts of that case.” (Citations omitted).
*236 D.C.’s good intentions notwithstanding, she has not shown an actual change in her behavior in the eight years that she has not had custody of her children. The trial court must have more than D.C.’s statement of positive goals for her future upon which to base a finding of a reasonable expectation of reformation. Although in this case, incarceration limits D.C.’s ability to make changes and take action, termination of D.C.’s parental rights was an alternative that evolved over many years and was something D.C. could have stopped many times before.
As it is, the trial court had only possible future reformation to consider, which included proposed placement of the children with someone the record shows |1fiwas on probation and with whom D.C. had used drugs, as well as D.C.’s estimate that she would require six months after her release to get herself together.
As in the instant case, the court in State in Interest of G.A., et al., 94-2227 (La.App. 1 Cir. 7/27/95), 664 So.2d 106, reviewed the termination of parental rights for a mother who was incarcerated and had a long history of substance abuse. Discussing whether there was a reasonable expectation of reformation in the foreseeable future, the court found:
The jurisprudence indicates that there is no expectation of reformation and no likelihood of reformation when the parent exhibits prolonged and consistent abusive or negligent behavior or a long history of substance abuse. State in the Interest of L.L.Z. v. M.Y.S., 620 So.2d at 1317. Furthermore, conduct such as mental or behavioral disorders which cause a parent to refuse to cooperate with the authorities in addressing the needs of. a child would also suggest that no reasonable expectation of reformation exists and that it is unlikely that the parent will reform. Id. However, a reasonable expectation of reformation is found to exist if the parent has cooperated with state officials and has shown improvement, although all of the problems that exist have not been eliminated. Id.
Although it appears that [the mother] may have made improvement and may have shown steps toward reformation as of the hearing date, we find that there was a reasonable factual basis to support the trial court’s determination that the State proved by clear and convincing evidence that there was no reasonable expectation of reformation by [the mother] in light of her continuous unwillingness to cooperate with the State and obtain substance abuse treatment, drug screening, and counseling during periods of non-incarceration. The evidence convinces this court that the mother’s attempts to reform have not been genuine nor long lasting. The future does not hold promise that she will substantially modify her established pattern of behavior once released from incarceration.
664 So.2d at 113. Similarly, in State in Interest of Latoya W., 97-0695, pp. 7-8 (La.App. 4 Cir. 2/4/98), 706 So.2d 688, 691, this court affirmed the trial court’s finding that reformation was not likely in the foreseeable future for a mother and a father whose children remained in foster care for years, during which time they 117admittedly had drug additions which caused them to neglect their children and engage in criminal acts.
In State in Interest of S.M. et al., 99-0526, p. 15 (La.App. 4 Cir. 4/28/99), 733 So.2d 159, writ denied, 99-2127 (La.7/21/99), 747 So.2d 36, the mother argued that although she had made errors in the past, she was currently trying to do things the right way. Finding no error in the trial court’s determination that the mother had not shown a reasonable expec *237 tation of reformation, this court noted, "... although [the mother] has professed an intent to exercise her parental rights, she has failed to demonstrate a substantial change or to alter a behavior which led to the adjudication of dependency in the first place.” 733 So.2d at 168.
Considering the circumstances in the instant case, the trial court’s decision not to believe that D.C. would actually change is reasonable. There is no manifest error in the trial court’s conclusion that the State had proven by clear and convincing evidence the third element of article 1015(5).
D.C. also argues that the State failed to prove that termination of her parental rights was in the best interest of her children. Although Johnson testified that A.M.C. did not indicate that she wanted to be adopted, A.M.C. did express a desire to remain where she was. And, although the record shows that D.O.C. and, to a lesser extent, L.A.C. have emotional and behavioral problems, the record clearly indicates that the OCS is and has been addressing these problems. From every indication, D.O.C. has improved because of the treatment he has received.
At the time of the termination hearing, a few letters from D.C. and Sanders to her children, regardless of how sincere or well-intentioned, cannot erase the |1ssolid ground, involving years of non-compliance with the case plan, for a finding that termination of D.C.’s parental rights is in the children’s best interest.
In State in Interest of S.M. et al., supra, this court, in an appeal after a remand from the supreme court, determined that it was in the children’s best interest to terminate their mother’s parental rights. Although the children in State in Interest of S.M. et al., had been in State custody for three years at the time of the termination hearing, a time frame much less than in the instant case, this court nevertheless concluded:
In State in the Interest of C.D., 558 So.2d 806 (La.App. 5th Cir.1990), the appellate court found that termination of parental rights was in the best interest of the child, noting that adults can take years to improve their functioning but children are not granted the same amount of time. Children’s lives are significantly disrupted while their parents are attempting to deal with their own problems.
* * Hi * % *
Children need a stable, safe home in which to thrive. It is not disputed that the longer the children remain in foster care, the chances of them achieving long-term continuous family relationships through adoption are diminished. Based on the young ages of these children, these are critical years in their development. Although a parent obviously has an interest in preventing parental rights from being prematurely severed, the rights of the parent must yield to the best interests of the children.
733 So.2d at 168. Similarly, in the instant case, it is the sheer length of time these children have been in State custody and apart from D.C. that compels the conclusion that termination of D.C.’s parental rights is in the children’s best interest. Even considering the great amount of time the children have been in State custody, the record reveals lengthy stays in one foster home for each of D.C.’s daughters, along with indications of possible adoption. While D.C.’s son has not been as fortunate, evidence of his improved condition is encouraging.
| ^CONCLUSION
For the reasons provided above, we conclude that the State provided clear and *238 convincing evidence of the statutory grounds for termination of D.C.’s parental rights and obligations. We further find that the trial court was not manifestly erroneous in rendering judgment terminating D.C.’s parental rights based on its finding that the State had proven the grounds for termination of parental rights and that such action was in the best interest of the children.
Accordingly, for the reasons given, we affirm the judgment of the trial court.
AFFIRMED.

. T.L. is the biological father of A.M.C. and L.A.C.; M.F. is presumed to be the biological father of D.O.C. Neither man appealed the judgments terminating their parental rights as to their children.

. The record indicates that the only time one of D.C.’s children was taken out of foster care from 1992 to 1998 was when D.O.C. was placed in an institution in April 1997 because of his behavioral and emotional problems.

. The record shows that D.C. had another daughter, born in 1999. Kenneth Sanders is this child’s father.