L KLEES, Chief Judge.
This is an appeal from a judgment of the juvenile court terminating parental rights. For the reasons stated herein, we affirm the trial court’s judgment.
FACTS AND PROCEDURAL HISTORY
This matter has previously been before this Court. Appellant herein, N.M [1], is the mother of three children who were placed in custody of the State of Louisiana in January of 1996. By opinion dated March 4, 1998, a panel of this Court affirmed a judgment of the juvenile court adopting the State’s permanence plan of reunifying the children with their mother. State in the Interest of S.M., 97-1896 (La.App. 4 *161 Cir. 3/4/98), 709 So.2d 927. The Supreme Court granted the children’s application for writs to review the correctness of the lower courts’ decisions. State in the Interest of S.M., 98-0922 (La.5/15/98), 719 So.2d 59. Thereafter, the Supreme Court rendered an opinion reversing the trial court’s judgment and the opinion of this court, and remanded the matter to the juvenile court for further proceedings. State in the Interest of S.M., 98-0922 (La.10/20/98), 719 So.2d 445. On remand; the permanence plan for reunification was withdrawn, and the State Office of Community-Services (OCS) changed its plan to termination. The attorney for the children also filed a Petition for Involuntary Termination of Parental Rights, and the State subsequently joined in this petition. On December 11, 1998, the juvenile court rendered a judgment in favor of | ¡^petitioners terminating the mother’s parental rights.[2] It is from this judgment that N.M. now appeals.
The facts underlying this juvenile proceeding were accurately stated in the opinion of the Supreme Court as follows:
Between her 16th and 18th birthdays, N.M. gave birth to three children: K.M., a boy, on July 16, 1991; S.M., another boy, on November 2, 1992; and J.M., a girl, on June 13, 1994. After KM.’s birth, he lived with Rosa Dunn, his great grandmother, and after S.M.’s birth, he lived with Edna Dunn, the mother of Lonjay Earlycutt, the man with whom N.M. lived during her pregnancy and who believed he was S.M.’s father. N.M. has never lived in a home of her own. She mainly lived in an apartment provided by others.
After N.M. was pregnant with J.M., she began living with James Johnson who was approximately twenty-four years of age. During this same period of time, N.M., for the first time, brought her two sons, K.M. and S.M., to live with her. On January 10, 1996, Johnson beat S.M., the middle child who was three years old, so badly that N.M. called 911 because S.M. was not breathing; the beating occurred, in part,- while N.M. was not at home and continued after she returned home. When the police, arrived at the scene, they found S.M. unconscious and not breathing, with bruises and welts about his body, and two black eyes. Although the police officers thought that S.M. was DQA, they transported him to the nearest medical facility, Medical Center of Louisiana, where he was revived. Upon medical examination, it was determined that S.M. had multiple scalp bruises, a right temporal contusion, periorbital swelling, an old trauma on his chest with generalized bruising, old abdominal scars, bruised lower extremities with old burns, burns on the left knee and ankle, an open laceration on the right hand, an abrasion to the left axilla, an ulcer on the glans penis which had second-degree burns as well as healed burns, and multiple old scars on the back and buttocks. Orthopedic examination showed that S.M. suffered a fracture of the distal left ulna with callus formation compatible with healing which required the placement of a plaster cast, as well as a dislocation fracture of the capitulum of the humerus.
| ^Matthew Riles, a detective assigned to the Child Abuse Section of the Emergency Services Bureau, interviewed N.M. She told Detective Riles that Johnson had been abusing S.M. since March of 1995. She said that Johnson made S.M. sleep in the bathtub almost every night because S.M. often wet the bed. She also described . incidents where Johnson struck S.M. with his hands and a bowl of food and one occasion where Johnson burned S.M. with hot water. She told Detective Riles that she had *162 not told anyone about the abuse because Johnson had threatened to “take care of her” if she told and she was afraid.
Detective Riles also questioned K.M., who, along with J.M. and N.M., had been brought to the Child Abuse Office when S.M. was hospitalized. K.M. told Detective Riles that Johnson hit him, and had put hot water on him and S.M. He further described, occasions where Johnson hit S.M. with his hands and his mother’s shoe, and where he had tied S.M.’s hands. A medical examination of K.M. revealed bruises on his -chest and behind his right ear, as well as old scars from belt marks on his buttocks. Medical personnel also examined J.M. and found that she had a bump on her forehead.
Based upon the children’s abusive injuries and the above information, N.M. and Johnson were arrested. N.M. was charged and pleaded guilty to three counts of cruelty to juveniles. She was sentenced to concurrent five year terms with the Department of Corrections on each count; the sentencing court suspended the sentence and placed N.M. on five years active probation. As a special condition of probation, the sentencing court required N.M. to serve twelve months imprisonment with the Department of Corrections, earn her graduate equivalency diploma (GED), and obtain vocational technical school training. Johnson was charged with three counts of cruelty to a juvenile and the attempted second-degree murder of S.M. He pleaded guilty and was ordered to serve an eight and one-half year sentence, without the benefit of probation or suspension of sentence.
On January 11, 1996, an oral instanter order issued, placing N.M.’s three minor children in the protective custody of the State. At a probable cause hearing held on January 12, 1996, the Juvenile Court for the Parish of Orleans found that there were reasonable grounds to find the three children abused and neglected, and in need of care, and awarded their provisional protective custody to the State. On February 12, 1996, the District Attorney initiated proceedings to have the Rthree minor children adjudicated children in need of care. At a hearing on May 16, 1996, it was stipulated that the three minor children, K.M., S.M., and J.M., were abused/neglected children in need of care, and an order issued placing them in protective custody. The juvenile court awarded the care, custody and control of the children to the Office of Community Services (OCS) for a period of eighteen months. S.M. was placed in the home of a foster parent; K.M. and J.M. were placed in the home of their maternal great grandmother, Rosa Dunn. On August 30, 1996, S.M. was moved from the first foster home and placed in the home of Edna and Edgar Alexis.
On November 4, 1996, after serving approximately nine months of her sentence, N.M. was released from prison and began her five year probationary period. Upon release from prison, N.M. moved in with Johnson’s sister.
719 So.2d at 446-447.
On November 14, 1996, following a review hearing, a judgment was entered continuing the children in the custody of OCS and in their placements. The judgment provided for weekly visitation by the mother and further ordered the mother to participate in several educational programs, submit to psychological evaluation, obtain stable housing and maintain regular contact with OCS. At the Permanency Placement Planning hearing on July 31, 1997, the trial court heard testimony of N.M. and the OCS case worker who stated that N.M. was meeting some of the requirements set forth in the case plan. Based on this testimony, the juvenile court approved the permanence plan for reunification.
This Court affirmed the judgment, and the children’s attorney appealed to the Supreme Court, urging that N.M. was unfit to retain parental control and that there *163 was no reasonable expectation of reformation in the foreseeable future. The | «Supreme Court agreed and concluded that reunification therefore was not in the best interests of the children. The matter was then remanded “to the juvenile court for OCS to propose a new Permanency Placement Plant for these children.” State in the Interest of S.M., 719 So.2d at 453.
Following the remand, OCS changed its Permanency Placement Plan to termination of N.M.’s parental rights based on the directives of the opinion rendered by the Supreme Court. At a review hearing held on November 12, 1998, the juvenile court noted its concurrence with this amended plan and further noted that N.M. was considering surrendering the minor children for adoption. However, the record indicates that N.M. failed to agree to the surrender, and the attorney for the children filed a Petition for Involuntary Termination of Parental Rights on November 19, 1998 based on the grounds set forth in LSA-Ch.C. Art. 1015(5).
Trial of this matter was set for December 8, 1998. On the' morning of trial, attorney for N.M., Cedric Richmond, appeared and requested a continuance based on the fact that he had only recently been retained by N.M. on the evening of December 4, 1998. The trial court granted a one-day extension of the trial, or until December 9,1998.
At the trial of this matter, the trial court heard the testimony of several witnesses, including N.M. and the OCS case workers. By judgment' dated December 11, 1998, the trial court ordered the termination of N.M.’s parental rights. This appeal followed.
I «DISCUSSION
By her first assignment of error, N.M. contends that the trial court erroneously applied the burden of proof in this matter. Appellant contends that this is a legal error that requires a de novo review by this court. We do not agree.
The grounds for involuntary termination of parental rights are set forth in Article 1015 of the Louisiana Children’s Code. In order to terminate parental rights, the State or petitioner bears the burden of proving every element of any one section of that article by clear and convincing- evidence. La. Ch. C. Art. 1035.
Appellant contends that the trial court placed the burden on her to prove why her rights should not be terminated, rather than on the petitioners seeking the termination to prove the grounds for the termination. In arguing that the trial court shifted the burden of proof in this matter, appellant relies on the following statements made by the trial court at the hearing in the petition for termination:
You are not going to try this case again. You’re going to have to show me why parental rights should not be terminated. You’re going to have to show me that there has been a significant change in the lifestyle of the mother of these children, if you are prepared to do that.
However, a review of the entire portion of the trial transcript reveals that the trial court made this statement in response to petitioners’ argument that the scope of the evidence at trial should be limited to evidence not considered by the Supreme Court. This argument was based on the holding by the Supreme Court that there was insufficient evidence to support the trial court’s finding of reformation by the mother through the hearing held in the trial court on May 4, 1998. The Supreme Court remanded the matter to consider evidence of reform 17beyond that date which was not part of the record before the Supreme Court. The statements made on the record by the trial court were not related to the burden of proof, but rather were part of a discussion concerning the scope of the evidence to be introduced at the trial on remand.
We have reviewed the entire transcript in this matter, and we find no error of law in the trial court’s application of the bur *164 den of proof in this matter. In fact, when counsel for appellant directly questioned the trial court as to the application of the burden of proof, the trial court responded, “I’ll decide what’s what and I’ll make my decision based on what I hear.” Further, the trial judge stated, “we are here to determine whether or not the parent has complied and what is in the best interests of the children.” Appellant’s argument is without merit.
In her next assignment of error, N.M. contends that the trial court erred in ■ refusing to grant a continuance for more than one day. Appellant’s counsel contends that he was only retained by N.M. three days before the trial was scheduled to begin, and the case was not ready to be tried. Appellant alleges that no witnesses had been subpoenaed, and the failure to grant a longer continuance resulted in the termination of N.M.’s fundamental right to raise her children.
La. Ch.C. Art. 1032 provides that in setting a trial for termination of rights “the court shall avoid delays in resolving the status of the parent and in achieving permanency for the child.” Further, the Supreme Court in its opinion rendered on October 20, 1998 remanded the matter to the juvenile court giving specific instructions to proceed expeditiously with the matter to the extent practicable. The court stated that “the juvenile court shall hold a hearing and decide the issue of Permanency Placement Plan and/or petition of N.M.’s parental rights and any related issue within twenty days after either or both of these proceedings is filed.” IsThe record indicates that a Petition for Involuntary Termination of N.M.’s rights was filed by the children’s attorney on November 19, 1998 after a period of time in which the mother considered the alternative of surrendering her children for adoption. Counsel was appointed for the mother and she was aware of the trial date set for December 8, 1998. On December 4, 1998, N.M. chose to retain private counsel.
The trial court granted counsel’s motion for continuance for one day, or until December 9,1998, the twentieth day after the termination petition was filed. Counsel has failed to allege any further evidence or testimony which would have changed the outcome of the trial. Our review of the record in this case reveals that counsel for N.M. was well-prepared and effective, and we fail to find any prejudice to N.M. by the granting of a one-day continuance. In light of the Supreme Court’s directives and the important interest of the children in having this matter resolved as expeditiously as possible, we find no abuse of the trial court’s discretion in granting this brief continuance. Appellant’s argument is without merit.
Appellant next contends that the trial court was manifestly erroneous when it ruled that N.M. failed to substantially comply with her case plan and that there was no reasonable expectation of reformation in N.M.’s future. At issue is whether the trial court erred in finding that the petitioners proved that N.M.’s rights should be terminated by clear and convincing evidence based on the provisions of the Children’s Code.
Petitioners based the action for termination on La.Ch.C. Art. 1015(5), which provides:
The grounds set forth in the petition must meet all of the conditions of any one of the following Paragraphs:
|9(5) Prior adjudication as a child in need of care and removal from the parental home
(a) One year has elapsed since a child was removed from the parent’s custody pursuant to a court order in a child in need of care proceeding and placed either in the custody of an agency or individual.
(b) The parent is now unfit to retain parental control, and there is no reasonable expectation of his reformation in the foreseeable future.
*165 (c) The department has made every reasonable effort to reunite the child with his parents to no avail but now recommends that reunification would not be in the best interests of the child.
A court’s findings as to whether there has been substantial compliance with a case plan or a significant substantial indication of reformation has been shown and whether the parent is likely to reform will not be set aside absent manifest error. State in the Interest of BJ, 95-1915 (La. App. 1 Cir. 4/4/96), 672 So.2d 842, 351, writ denied, 96-1036 (La.5/31/96), 674 So.2d 264.
La.Ch.C. Art. 1036 was amended effective August 15, 1997 and now provides statutory guidance in determining whether a parent has complied with a case plan or whether the parent has shown reformation sufficient to preserve family reunification as a viable option to termination of parental rights.
With regard to compliance with the case plan, Art. 1036(C) provides the following guidelines:
C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent’s failure to attend court-ordered approved scheduled visitation with the child.
(2) The parent’s failure to communicate with the child.
| in(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent’s ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the cost of the child’s foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing -the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
In their brief filed in this court, OCS concedes that N.M. complied with the criteria listed , in subsections (I), (2), and (3) and that subsection (4) is not applicable. However, the State argues that N.M. failed to comply with the more difficult challenges set forth in the remaining criteria.
As noted in the trial court’s oral reasons for judgment, at the time of the termination hearing, N.M. had not completed individual therapy and had not started family therapy. In the three years that her children had been in State custody, N.M. had been to three different therapists. The mental health evaluations of each of these therapists were consistent: N.M. had not made significant progress toward changing the conduct that led to the removal of her children from her care.
In support of their claim that N.M. had not complied with the aspect of her case plan to participate in individual psychotherapy and family therapy, petitioners introduced the progress report of Dr. Alesia Williams dated November 2, 1998. Although N.M. attended six out of seven therapy sessions with Dr. Alesia Williams in September and October of 1998, the report of Dr. Williams indicates that N.M. In should continue therapeutic services for an additional six months to resolve the issues which caused her to allow the abuse of the children while they were in her care. The report of Dr. Williams also states that N.M. should maintain stable housing and obtain a job which corresponds with her children’s school hours.
As stated by the trial court at the time of the termination hearing, N.M. did not have stable housing for herself and for her children, an item which was part of her *166 case plan. Although she had applied for Section 8 housing and had been placed on the “waiting list,” she had not obtained a permanent residence at the time of trial even though her children had been removed from her care for almost three years. Further, evidence in the record indicated that she was dependent on OCS to pay the deposit and buy the furniture for this apartment. The record further indicates that between May and December of 1998, N.M. had changed residences several times and was living on a temporary basis with friends and family without a residence of her own. The trial court was apparently not persuaded by N.M.’s testimony that she planned to live temporarily with her aunt.
Finally, the evidence in the record fails to indicate that N.M. sufficiently complied with the removal of the persistence of conditions that led to the children’s removal from her care in the first place. As stated in the report of Dr. Williams, N.M. continues to require therapy to resolve her low self-esteem and to develop a system to protect herself and her children from further physical abuse. These are the conditions that enabled the abuse of the children which required their removal from N.M.’s care, and these conditions persisted at the time of the termination hearing.
|i2Under the circumstances presented here, we find no manifest error in the trial court’s determination that N.M. failed to substantially comply with significant aspects of her case plan.
We turn next to the issue which the Supreme Court in its opinion found to be the most significant: whether N.M. exhibited behavior which would support a reasonable expectation of improvement or reformation in the near future. As stated by the Supreme Court in its opinion, the clarification of the word “reformation” as provided in La. Ch.C. Art. 1015(5) was accomplished by the amendment to La. Ch.C. Art. 1036. The Supreme Court noted that the amended article could be applied by the trial court on remand. 719 So.2d at 453. Subsection (D) of La. Ch.C. Art. 1036 currently provides:
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of harm, based upon expert opinion or based upon an established pattern of.behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based on expert opinion or based upon an established pattern of behavior.
11-¡There is no evidence in the record that subsections (1) and (2) apply to the facts of this case. However, the third factor refers to any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based on expert opinion or based on an established pattern of behavior.
Appellant contends that the trial court was manifestly erroneous in finding insufficient evidence of reformation in light of the testimony of the OCS workers that N.M. was making considerable progress toward achieving the goals of her case plan and should be reunited with her children. However, although there is testimony in the record that the caseworkers believed N.M. was making progress, there was significant conflicting evidence that reunifica *167 tion was not recommended. The report of Dr. Williams dated November 2, 1998 reflects findings consistent with the evaluations made by Dr. J. Steven York, Ph.D., as reflected in his report of January 8, 1997, and reiterated by Ruth W. Landis, MSW in her report issued in January of 1998. Dr. Williams’ report contains the following concerns:
Her relationships with others are viewed as temporary or relationships to be shared with others. She does not view herself as worthy of relationships that are non-shared. While she desires to have her children returned to her she feels powerless and believes that her relationship with her children will be like all other relationships she has had in her life ... She perceives that communal efforts will help her to provide the nurturing her children need. She does not appear to perceive danger in relationships she chooses to enter into. She may be somewhat naive and does not suspect others of having ulterior motives when providing her with assistance. Given her history and perceptions of self worth, it is very likely Mrs. Manning will continue to enter into relationships that are not intended to be long lasting relationships. She has no experience with long lasting relationships. She continues to require therapeutic services to change her pattern of relating to others.
| uAccording to this report, which was based on evaluations conducted in September and October of 1998, there has not been substantial or significant reformation in N.M.’s behavior or psychological development that removes or reduces the risk that she may expose the children to a dangerous circumstance. Further, the report indicates that N.M. requires additional therapy, although N.M. testified at trial that she believed she had complete therapy with Dr. Williams. In addition to her failure to make significant progress in therapy, N.M. failed to obtain and maintain adequate housing for herself and her children. Although there is evidence in the record that N.M. was trying to obtain housing, she had not been successful at the time of the termination hearing, and there was no clear indication of when such permanent housing would be obtained. From April - December of 1998, N.M. lived with three different people in four different residences. The fact that N.M. did not obtain a residence of her own supports a finding that she is maintaining the same lifestyle and has not achieved the reformation required for reunification. Additionally, the record indicates that although N.M. had been successful in obtaining employment, she had no improvement in the management of her financing.
Although the record evidence indicates that there has been some cooperation by N.M. with the juvenile court’s requirements, the evidence does not show that she has shown improvement. Based on the evidence in the record, it is clear that she has not eliminated the behavior that led to the adjudication of dependency. Reformation sufficient to prevent termination of parental rights requires that the parent demonstrate a substantial change, such as Significantly altering or modifying that behavior which served as the basis for, and resulted in the State’s removal of |isthe children from the home. State in the Interest of J.M., 30,302 (La.App. 2 cir. 10/29/97),702 So.2d 45, 49, writ denied, In the-Interest of J.M., 97-2924 (La.2/6/98), 709 So.2d 736.
. In the present case, N.M. spent nine months in jail as a result of her conviction for the cruelty to these children. Prior to that, she had not raised the older two children for the first years of their lives. The youngest of the three, Jasmine, was only an infant when she was removed from her mother’s care. The only time these children lived with their mother was during the time of the abuse. N.M. does not have a history of exercising parental responsibility for these children or meeting their immediate and continuing emotional and physical needs for an extended period *168 of time.' She became . pregnant for her fourth child within one month of her re-1 lease from incarceration, and this pregnancy further delayed her efforts to establish a permanent home for her older three children.
Counsel for appellant argued that although she may have made errors in the past, she was trying to do things the right way now. However, although N.M. has professed an intent to exercise her parental rights, she has failed to demonstrate a substantial change or to alter a behavior which led to the adjudication of dependency in the first place. Under the circumstances presented here, we find no manifest error in the trial court’s determination that N.M. has not shown a reasonable expectation of reformation sufficient to prevent the termination of her parental rights.
At the time of the termination hearing, the children in this case had been in the protective custody of the State for almost three years. In State in the Interest of C.D., 558 So.2d 806 (La.App. 5th Cir.1990), the appellate court found that | ^termination of parental rights was in the best interest of the child, noting that adults can take years to improve their functioning but children are not. granted the same amount of time. Children’s lives are significantly disrupted while their parents are attempting to deal with their own problems.
The reports and testimony of the mental health professionals who treated the three children were introduced into evidence at the termination proceeding. As of May 4, 1998 (the date of the final review hearing prior to the termination hearing), all of the mental health professionals were opposed to reunification. Sharee Buddington, the OCS caseworker assigned to N.M.’s case, testified at the termination hearing that she was aware that the mental health professionals who treated each of the children felt it would be detrimental for the children to be removed from their current placements and returned to the care of their mother.
Two of the children, KM. and J.M., began seeing new therapists in July of 1998. The reports of these therapists are found in the record, but the reports do not contain opinions as to whether reunification or termination would be in the best in interest of the children. However, the report of Rodney Walter, the therapist for K.M., stated that it is in R.M.’s best interest “to clarify as much as possible and as quickly as possible what his long term placement plans might be.” As of the time of the termination hearing, OCS was unaware of what point in time when N.M. would be ready to be reunited with the children.
Children need a stable, safe home in which to succeed and thrive. It is not disputed that the longer the children remain in foster care, the chances of them achieving long-term continuous family relationships through adoption are diminished. Based on the young ages of these children, these are critical years in |17their development. Although a parent obviously has an interest in preventing parental rights from being prematurely severed, the rights of the parent must yield to the best interests of the children. Our careful consideration of the record supports a finding that the best interests of the three children in this case have been served by the termination of parental rights in this case.
CONCLUSION
For the reasons assigned herein, we conclude that N.M. is unable to provide an adequate permanent home for these children, and the best interests of the children require that the rights of the mother be terminated. The. petitioners provided clear and convincing evidence that N.M.’s parental rights should be terminated, and the juvenile court was not clearly wrong in entering the judgment of termination. Ac *169 cordingly, the judgment of the trial court is affirmed.

AFFIRMED.

. In keeping with the policy of this Court, the parties will be referred to by their initials or other generic identifiers.

. The judgment also ordered the termination of the parental rights of the fathers of these children. However, there was no appeal from this portion of the judgment, and that issue is not before us here.