STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2021 CJ 1328

STATE OF LOUISIANA,
IN THE INTEREST OF H.R., L.A., J.A., R.A., E.A.

Judgment Rendered:     **FEB 2 5 2022**

* * * * *

Appealed from the
22nd Judicial District Court
Parish of St. Tammany, State of Louisiana
No. JC 0285 2019

The Honorable Scott Gardner, Judge Presiding

* * * * *

| | |
|---|---|
| Jane Hogan<br>Hammond, Louisiana | Attorney for Appellant,<br>R.A. |
| Betsy Humphries Smith<br>Mandeville, Louisiana | Attorney for Appellees,<br>H.R., L.A., J.A., R.A., and E.A. |
| Kimberly E. DeBrock<br>Covington, Louisiana | Attorney for Appellee,<br>State of Louisiana, Department of<br>Children and Family Services |

* * * * *

BEFORE:  McDONALD, LANIER, AND WOLFE, JJ.

**WOLFE, J.,**

The mother of five minor children appeals the trial court's judgment that terminated her parental rights, as well as the parental rights of the children's fathers, and freed the children for adoption. We affirm.

## FACTS

On October 25, 2019, H.R. (born April 11, 2008), L.A. (born July 15, 2010) J.A. (born August 1, 2013) and twins, R.A. and E.A. (born November 16, 2015), were removed from the custody of their mother, R.A., and D.A. (the father of L.A., J.A., R.A., and E.A.), and placed in state custody by instanter order. The Department of Children and Family Services (DCFS) had received a report that R.A. and D.A. were manufacturing and selling methamphetamine in their home, using drugs, and facing eviction. DCFS's investigation revealed the home in which the children were living was unsafe due to holes in the ceiling, exposed electrical wiring, and the presence of rodents. Further, R.A. and D.A. admitted to almost daily use of methamphetamine for the preceding two months, were unemployed, and had no resources to assist with gas, food, or housing. R.R., the father of H.R., was reportedly living in New York, but his whereabouts were unknown. DCFS implemented two safety plans, placing the children first with a paternal uncle and then with the paternal grandmother; however, neither relative was able to continue caring for the children. Continued custody, with the children placed in certified foster homes, was confirmed based on the allegations supporting the instanter order.

On November 26, 2019, the District Attorney's office filed a child in need of care (CINC) petition for the five children. In addition to setting forth the grounds that supported the instanter order, the petition alleged that R.R. had not provided support or visited with H.R. since H.R. was seven months old.[1] DCFS's report

---

[1] DCFS was unable to locate R.R. after a clear search. A curator was appointed to represent R.R. in these proceedings.

indicated that R.A. and D.A. were seeking inpatient substance abuse treatment. At the adjudication hearing, the parents, through their appointed counsel, stipulated the children were children in need of care, without admitting to the allegations of the petition, and the children were adjudicated children in need of care. The trial court ordered that the children remain in state custody, in their foster home placements, and approved DCFS's case plan with the goal of reunification.

To achieve the goal of reunification, the case plan required the parents to obtain and maintain safe and stable drug-free housing that met the children's basic needs; allow DCFS to assess the home for safety, including criminal background checks on persons 18 years of age or older living or frequently staying overnight in the home; maintain contact with DCFS; complete the substance abuse treatment program recommended by DCFS and follow all recommendations; remain drug free and submit to random drug screens as directed by DCFS; maintain legal income and submit verifiable proof of such on a monthly basis; complete a mental health assessment and follow all recommendations; keep DCFS informed of the family's needs; and enroll in and complete the domestic violence program "Truth 180." Further, the parents were required to attend meetings, visits with the children, and court hearings; complete parenting classes; demonstrate positive parenting on visits; and pay support for the children in the amount of $25.00 per child (totaling $125.00 per month for R.A.), beginning in November 2019, with payments remitted to DCFS.

On April 22, 2020, the trial court held a six-month review hearing, where the parents again stipulated that the children remain in state custody without admitting to the allegations against them. DCFS reported on the parents' compliance with case plan requirements, noting that after completing a 28-day drug treatment program, R.A. continued to have negative drug screens; however, D.A. repeatedly tested positive for cocaine, methamphetamine, and amphetamine. D.A. had also been

3

arrested for drug court sanction. DCFS reported that R.A. had been employed since January 2020, but had not made monthly financial contributions toward the children's care. R.A. and D.A. had attended "most" family visits since completing inpatient treatment, though it was noted D.A. appeared to be impaired on several of them. The trial court approved the updated case plan and retained the goal of reunification, but prohibited contact between the children and their fathers until the fathers provided DCFS with evidence of sobriety.

Prior to the scheduled twelve-month review hearing, R.A. obtained a protective order against D.A., and the couple separated. At a special review hearing conducted the next month, the case worker testified that R.A. had a new boyfriend who lived in the same home where R.A. was renting a room. The case worker stated R.A. questioned whether her boyfriend needed to work the case plan and was advised that he would need to complete a criminal background check. R.A. related that her boyfriend had a criminal past and expressed some concern about the charge; however, the case worker was unsure of its specific nature. The case worker further related that it was unclear whether R.A. intended to continue the relationship. At the conclusion of the hearing, the trial court ordered that the children remain in state custody and maintained the existing case plan with the goal of reunification.

In advance of the twelve-month review hearing, DCFS recommended that it was in the best interest of the children to change the case plan goal to adoption. DCFS reported that neither D.A. nor R.R. had complied with the case plan. DCFS reported that R.A. was compliant with some but not all requirements of the case plan. In particular, R.A. had not completed her drug treatment program, completed parenting intervention, attended all court hearings and meetings, or reported current employment. Further, it was reported that R.A. had not made monthly financial contributions toward the care of the children, though it was noted that she received $4,900.00 in stimulus funds that she used to purchase a car despite not having a valid

4

driver's license. With regard to housing, it was reported that R.A. was renting a three-bedroom trailer in Denham Springs for $800.00 per month, where her boyfriend, B.G., and his children also lived. It was noted that B.G. was a sex offender who registered as living at R.A.'s address.

At the twelve-month review hearing, the DCFS case manager testified that DCFS did not consider R.A.'s home to be safe and stable due to her live-in boyfriend. R.A. reportedly told the case worker that she needed him to stay with her because she could not otherwise "afford to do it." The case manager reported that R.A. completed a psychological assessment and made some "parental contributions to the children." R.A. reportedly had a new job, but DCFS had no details about the employer. The case manager explained that R.A. was referred to parenting classes in St. Tammany Parish but the provider did not return R.A.'s call so R.A. did not begin the classes.

The case manager was asked why DCFS was not opting to allow R.A. more time to work her case plan and responded that R.A. had not fully addressed the reasons that the children came into care. The case worker expressed particular concern that R.A. had a history of abusive relationships and was now living with and financially dependent on a registered sex offender. At the time of the hearing, B.G. had not agreed to a criminal background check and R.A. had expressed that she did not believe he "had to work a case plan." DCFS had only unofficial information that B.G. was convicted in 2004 of contributing to the delinquency of a juvenile to perform sexually immoral acts. The case worker testified she advised R.A. that DCFS could not recommend that the children live in the same home as B.G. and R.A. responded that she needed help and could not support five children on her own.

R.A. testified at the hearing that she had been drug-free for nearly one year. She confirmed that she was no longer involved with D.A. and that she was living in Denham Springs with B.G. and his children. She stated that she started a new job

5

the previous week and described her monthly expenses, including $800.00 in rent that was soon increasing to $1,000.00. She explained that she used the stimulus money she received to buy a vehicle in compliance with "one of [her] stipulations," noting that she needed to be able to transport her children. R.A. testified that she always brought food when she visited the children and bought the children other things they wanted, such as sandals. She stated she intended to find a second job to better support her children, explaining that she had no family or support system nearby. R.A. indicated, however, that B.G. and his family were willing to help with anything they could. When asked about B.G. being a sex offender, she explained that he was a "Tier 1 sex offender with no restrictions." When asked about the charge, R.A. testified that he told a girl to perform oral sex on him when she asked for money. R.A. denied that B.G. touched the girl and claimed the girl tried to have the charges dropped.

After hearing the testimony presented, the trial court ordered that custody of the children be continued with the state. The trial court approved the updated case plan, including the change of the case plan goal to adoption, finding it to be in the best interest of the children's safety and well-being.

Thereafter, DCFS filed a petition for termination of parental rights and certification for adoption. DCFS asked that R.A.'s rights be terminated pursuant to La. Ch. Code art. 1015(5)(b), for abandonment of the children by failing to provide significant contributions to the children's care for a period of six consecutive months, and Ch. Code art. 1015(6), failure to comply with her case plan. In support, DCFS alleged that R.A. made no child support or parental contributions after the children entered state custody. Additionally, DCFS alleged that more than one year had elapsed since the children were removed from R.A.'s custody and R.A. had not substantially complied with the court approved case plans. Specifically, DCFS maintained that R.A. had not maintained a safe and stable home and was living with

6

a registered sex offender; had not successfully completed the recommended substance abuse program; had not maintained employment; and had not completed parenting intervention.

In advance of the scheduled eighteen-month review hearing, DCFS reported that R.A. continued to live with B.G. in Denham Springs. It was noted that during scheduled visits, R.A. gave the three oldest children money as a treat. However, DCFS reported that R.A. made no financial contributions toward the children's care. DCFS recommended that custody remain the same with a continued goal of adoption. The parents entered stipulations without admissions. The trial court approved the case plan, continuing custody with the state in the current placements, with the case plan goal of adoption.

On May 4, 2021, the trial court held a hearing on the petition for termination of parental rights. The case worker testified about the history of the case and R.A.'s noncompliance with the case plan. The case worker acknowledged that R.A. gave cash to the children on two occasions and sometimes brought them treats and shoes; however, DCFS did not consider those gifts to be financial contributions toward the care of the children. The case worker also explained that DCFS was concerned about R.A.'s housing situation because R.A. chose to reside with a registered sex offender, which DCFS considered to be an unsafe environment for young girls.

Based on the evidence presented, the trial court found DCFS proved the allegations of the petition by clear and convincing evidence. The trial court further found that termination of the parents' rights was in the best interests of the children. After issuing written reasons, the trial court signed a judgment on May 19, 2021, terminating the parental rights of R.A., D.A., and R.R.

R.A. now appeals, arguing that she did comply with her case plan and did not abandon her children. She further challenges the trial court's determination that

7

termination was in the best interest of the children since the children are now separated from their siblings.

## DISCUSSION

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights in this state. **State ex rel. H.A.B.**, 2010-1111 (La. 10/19/10), 49 So.3d 345, 367. The purpose of an involuntary termination proceeding is "to protect children whose parents are unwilling or unable to provide safety and care adequate to meet their physical, emotional, and mental health needs, by providing a judicial process for the termination of all parental rights and responsibilities and for the certification of the child for adoption." La. Ch. Code art. 1001. The focus is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. **State ex rel. J.A.**, 99-2905 (La. 1/12/00), 752 So.2d 806, 811. As set forth in La. Ch. Code art. 1001:

> Termination of parental rights is to be considered the first step toward permanent placement of the child in a safe and suitable home, and if at all possible, to achieve the child's adoption. The procedural provisions of this Title shall be construed liberally. The proceedings shall be conducted expeditiously to avoid delays in resolving the status of the parent and in achieving permanency for children.

The termination procedure requires that the State establish at least one of the statutory grounds for termination set forth in La. Ch. Code art. 1015 by clear and convincing evidence. La. Ch. Code art. 1035; **State ex rel. H.A.B.**, 49 So.3d at 368; see also **Santosky v. Kramer**, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (requiring, at a minimum, proof by clear and convincing evidence in termination of parental rights cases). Even then, the court should not terminate parental rights unless it determines that doing so is in the children's best interest. See La. Ch. Code art. 1037B; **State ex rel. H.A.B.**, 49 So.3d at 368.

Whether termination of parental rights is warranted is a question of fact subject to the manifest error standard of review. See **State ex rel. H.A.B.**, 49 So.3d at 368. Under the manifest error standard, the appellate court does not decide whether the factfinder was right or wrong; rather, the appellate court is required to consider the entire record to determine whether a reasonable factual basis exists for the finding, and whether the finding is manifestly erroneous or clearly wrong. **Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC**, 2014-2592 (La. 12/8/15), 193 So.3d 1110, 1116.

In this case, R.A.'s parental rights were terminated pursuant to La Ch. Code art. 1015(5)(b) and (6), which provide:

> (5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> * * *
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
>
> * * *
>
> (6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

R.A. contends the trial court erred in finding DCFS proved the grounds of abandonment by clear and convincing evidence. She argues that her failure to pay parental contributions is insufficient to terminate her parental rights without proof that her failure to pay was due to her intention to permanently abandon her children.

She argues that she remained active in the case and never demonstrated an intention to permanently avoid parental responsibilities.

The case plans approved by the court required R.A. to make monthly payments of $125.00, representing $25.00 per child. At the termination hearing, the case worker testified that R.A. did not make *any* of the payments required by her case plan.[2] The case worker stated that DCFS does not consider gifts that R.A. gave directly to the children to be payments made toward her parental obligation. Moreover, the gifts were described as $5 given to each child on one occasion, $10 given to each child on another occasion, as well as items such as a karaoke machine, shoes, and treats. Based on the record before us we cannot conclude the trial court was manifestly erroneous or clearly wrong in finding that R.A. failed to provide significant contributions toward the care of her children from the time the children were taken into custody until the time the petition was filed.

Under the plain language of La. Ch. Code art. 1015(5)(b), the intent to permanently avoid parental responsibility is demonstrated by the parent's failure to provide significant contributions to the children's care and support for any period of six consecutive months. Here, DCFS showed that R.A. made no significant contributions for a period in excess of one year. Thus, the trial court did not err in finding that DCFS proved by clear and convincing evidence the statutory ground of abandonment. See La. Ch. Code art. 1015(5)(b).

Even so, R.A. argues that termination pursuant to La. Ch. Code art. 1015(5)(b) was manifestly erroneous because there is no proof in the record that she had the financial means to make the monthly payments and was unwilling to do so. She

---

[2] We note that at the twelve-month review hearing the case worker indicated that R.A. made some "parental contributions to the children"; however, those contributions were not further described. Thus, even if that representation was correct, the trial court's determination that R.A. failed to make significant contributions to the children's care cannot be considered manifestly erroneous or clearly wrong. Moreover, on appeal R.A. acknowledges that she did not make the $25.00 per child monthly contributions.

maintains that her failure to pay was clearly the result of financial constraints and that she never demonstrated an intention to permanently avoid parental responsibilities. However, R.A.'s arguments are undermined by proof in the record that she was employed or receiving unemployment benefits at various times during the proceeding. See **State in Interest of T.L.**, 2021-0728 (La. App. 1st Cir. 12/22/21), ___ So.3d ___, ___ (2021WL6064211, *4) ("[A] parent alleging lack of employment as just cause for her failure to pay child support must how not only that she was unemployed but that she was unemployable."). It is also undisputed that R.A. received federal stimulus money that included amounts for the children, which she used to purchase a vehicle rather than making payments toward her case plan obligation. Furthermore, we find no indication that R.A. asked for a reduction in the amount of the required monthly payments during these proceedings, despite DCFS's consistent reports that she was noncompliant with that requirement of the case plan. R.A.'s arguments are without merit.

Although only one ground for termination need be established, in this case DCFS also produced evidence that R.A. failed to comply with her case plan. See La. Ch. Code art. 1015(6); **State ex rel. J.A.**, 752 So.2d at 811. On appeal, R.A. contends the trial court erred in finding DCFS proved that ground by clear and convincing evidence, arguing that she "completed most of her case plan and made substantial progress in any component she did not complete." She argues that instead of recognizing her substantial progress, DCFS moved for termination based on her relationship with B.G., without determining the nature of his sex offense conviction or whether he was restricted from interacting with children. She argues that DCFS then failed to prove that her relationship with B.G. threatened the children's safety.

Louisiana Children's Code article 1036C pertinently provides:

Under Article 1015(6), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

(8)(a) The parent's failure to provide a negative test result for all synthetic or other controlled dangerous substances, except for any drug for which the parent has lawfully received a prescription, at the completion of a reasonable case plan.

(b) For purposes of this Article, "controlled dangerous substance" shall have the meaning ascribed in R.S. 40:961.

The state's additional requirement under La. Ch. Code art. 1015(6) of proving the lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by:

(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior[; or]

(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time[; or]

(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home

for the child, based upon expert opinion or based upon an established pattern of behavior.

La. Ch. Code art. 1036D.

Reformation sufficient to prevent termination of parental rights requires that the parent demonstrate a substantial change, such as significantly altering or modifying the behavior that resulted in the State's removal of the children from the parent's custody. See **State in Interest of T.L.**, ___ So.3d at ___ (2021 WL 606422 at *5); **State ex rel. S.M.**, 99-0526 (La. App. 4th Cir. 4/28/99), 733 So.2d 159, 167, writ denied, 99-2127 (La. 7/21/99), 747 So.2d 36.

One of the requirements of the case plan was that R.A. "obtain and maintain suitable housing that [was] physically safe and [met] the basic needs of her children including food, clothing, shelter and transportation." The case plan specified that the home must be clean, safe, and drug-free, with electricity, running water, and food. By the time of the twelve-month review hearing, R.A. was living in a three-bedroom home that DCFS may have considered appropriate. However, DCFS made it clear to R.A. that the home was not considered suitable for purposes of the case plan because a convicted sex offender also lived there.

R.A. argues on appeal that the record contains no documentation about B.G.'s conviction or the nature of the crime other than R.A.'s testimony at the twelve-month review hearing. R.A. suggests that DCFS failed in its obligation to investigate the nature of B.G.'s conviction and assess whether he presented a danger to the children before taking the position that R.A.'s home was unsuitable. However, the case plan required R.A. to allow DCFS to assess her home for safety, which included criminal background checks of any adults living there. The case worker testified on multiple occasions that she advised R.A. that B.G. needed to complete a criminal background check; however, R.A. was at first evasive about the relationship and then disputed B.G.'s obligation to work the case plan. Thus, the record indicates that any lack of

evidence regarding B.G.'s criminal history is attributable to R.A.'s noncompliance with the case plan.

R.A. additionally argues that there is no blanket restriction against a parent cohabiting with a registered sex offender, contending that B.G.'s status as a sex offender does not automatically create a safety hazard for the children. R.A.'s argument in this regard misses the point that reunification with her children was dependent, in part, on her obtaining "suitable housing" that was, among other things, "physically safe." R.A. admittedly chose to live in a home with a registered sex offender who did not submit to a criminal background check. Furthermore, R.A. candidly testified about her dependence on B.G., stating she could not care for her five children without him and that she had no other support system. When all of these factors are considered together, the trial court's finding that R.A. failed to comply with the case plan requirement with regard to housing was not manifestly erroneous or clearly wrong.

Furthermore, the trial court's finding that R.A. failed to comply with the case plan was not based solely on R.A.'s housing situation. It is undisputed that R.A. took steps to address her substance abuse issues and had no positive drug tests after the children were taken into custody. However, the DCFS case worker testified that R.A. did not successfully complete the recommended substance abuse treatment program as required by her case plan and had not reported enrollment in any other substance abuse program. R.A. also failed to maintain legal income as required by her case plan, choosing to quit one job after approximately three months and failing to provide information about subsequent employment. Further, R.A. failed to make monthly contributions toward the children's care. Thus, after considering the entire record, we find no error in the trial court's determination that DCFS proved by clear and convincing evidence that R.A. was not substantially compliant with her case

plan and that there was no reasonable expectation of significant improvement in the near future.

We also find no merit to R.A.'s additional argument that DCFS failed to make reasonable efforts to reunify R.A. and her children. See La. Ch. Code art 682 (requiring DCFS to demonstrate that reasonable efforts were made to reunify the parent and children after the children are removed). The Children's Code defines "reasonable efforts" as "the exercise of ordinary diligence and care by department caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families." La. Ch. Code art. 603(25). This requires DCFS to at least direct parents toward appropriate agencies that may be able to assist them in meeting their responsibilities and removing the impediments to reunification with their children. See **State ex rel. A.T.**, 2006-0501 (La. 7/6/06), 936 So.2d 79, 86 n.8.

The case worker testified at hearings throughout this proceeding about the efforts DCFS made to assist R.A. in achieving all of the requirements of her case plan. The case worker indicated that DCFS contacted programs to assist R.A. with housing in St. Tammany Parish, but none were available at the time. R.A. then chose to move to Denham Springs with B.G. and chose to remain living with him even after she was advised that DCFS would not recommend reunification because of it. Considering the entire record, we cannot conclude that the trial court manifest erred in finding that DCFS made reasonable efforts to reunify R.A. and her children.

Finally, we find no error in the trial court's determination that termination of R.A.'s parental rights was in the best interest of the children. The Louisiana Supreme Court has explained:

> The interests of the parent must be balanced against the child's interest, but the child's interest is paramount. More than simply protecting parental rights, our judicial system must protect the child's right to thrive and survive. A child has an interest in the termination of rights that prevent adoption and inhibit the child's establishment of

15

secure, stable, long term, continuous family relationships. While the interest of a parent is protected in a termination proceeding by enforcing procedural rules enacted to insure that the parental rights are not thoughtlessly severed, those interests must ultimately yield to the paramount interest of the child. Children have a right to live in a safe, secure environment and to be reared by someone who is capable of caring for them.

**State In Interest of C.F.**, 2017-1054 (La. 12/6/17), 235 So.3d 1066, 1075 (citations omitted).

The DCFS case worker testified throughout this proceeding about the children's progress in their foster homes as well as the efforts the caretakers made to ensure that the children maintained contact with their siblings. In its oral reasons, the trial court stated that the need for permanence in these children of varying ages predominated its termination ruling. The trial court found that the best interests of the children were served by permanent homes, which was best achieved by the certified foster homes in which the children had been thriving. The trial court noted the children had established bonds with their caretakers and considered the danger of removal to the long-term health and well-being of each child far outweighed any other concerns. In its written reasons, the trial court indicated that the children needed the stability that adoption provides.

After thorough review, we find that the record supports the trial court's conclusion that termination of R.A.'s parental rights was in the best interest of H.R., L.A., J.A., R.A., and E.A. Thus, we find no error in the trial court's judgment terminating R.A.'s parental rights and freeing the children for adoption.

## CONCLUSION

The May 19, 2021 judgment of the trial court terminating the parental rights of R.A., D.A., and R.R. is affirmed. Costs of this proceeding are assessed to R.A.

**AFFIRMED.**